***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for modifications and additions contained herein. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Houser with modifications and additions.
On June 7, 2004, defendants entered a limited Notice of Appeal from the Opinion and Award entered by Deputy Commissioner Houser, assigning error to two issues: (1) the burden of proof as to plaintiff's disability, or lack thereof, between her termination date through her surgery date and the corresponding findings of fact, law and award on those errors; and (2) the findings of fact regarding back pain, medical causation and award of treatment for back pain. Except as modified herein, the findings of fact, conclusions of law and award of the deputy Commissioner become the law the case.
 *********** EVIDENTIARY MATTERS
At the hearing before the Deputy Commissioner, plaintiff submitted a Performance Review, which was admitted into the record, and marked as Plaintiff's Exhibit (1).
Also at the hearing before the Deputy Commissioner, defendants submitted the following:
a. A Comment Form from Sheila Martin, which was admitted into the record, and marked as Defendants' Exhibit (1);
b. A Copy of Defendant-Employer's Employee Handbook, which was admitted into the record, and marked as Defendants' Exhibit (2);
c. An Employee Relations Report dated 10 October 2001, which was admitted into the record, and marked as Defendants' Exhibit (3); and,
d. An Employee Relations Report dated 16 January 2002, which was admitted into the record, and marked as Defendants' Exhibit (4).
Defendants had notice at the hearing before the Deputy Commissioner that the records of the treating chiropractor would become a part of the record. It was not error for the Deputy Commissioner to permit the chiropractor's testimony to be taken by deposition and be made a part of the record.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement, which was admitted into the record, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. All parties are properly before the Commission, which has jurisdiction over the parties and over the subject matter.
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. An employer-employee relationship existed between plaintiff and defendant-employer in this matter on all relevant dates herein.
4. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
5. Plaintiff was an employee of Manual Woodworkers Weavers on October 16, 2001.
6. On or about October 16, 2001, plaintiff sustained an injury by accident.
7. On the relevant dates herein, the workers' compensation carrier for defendant-employer was The PMA Group.
8. At the hearing (before the deputy Commissioner), the parties submitted a Packet of Industrial Commission Forms and Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (2).
9. The issues to be determined (by the deputy Commissioner) are whether plaintiff's current medical conditions are causally related to her October 16, 2001, work-related foot injury, and whether or not plaintiff is entitled to temporary total disability benefits from January 16, 2002, and continuing until she returns to suitable employment.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty-nine (39) years of age, with her date of birth being October 30, 1963. Plaintiff is a high school graduate, whose work history includes various positions in retail, industry, and fast food, all involving working on her feet.
2. Plaintiff was hired by defendant-employer in 1999 and worked in a variety of departments prior to becoming a service technician. Plaintiff's work as a service technician required her to be on her feet constantly, as she provided sewing materials to the approximately 25 sewing machine operators in her area. Plaintiff's duties required her to walk to various parts of the plant to obtain the materials needed by the sewing machine operators.
3. On October 16, 2001, plaintiff was walking across defendant-employer's warehouse floor when she stepped on a spool of thread, causing her right foot to twist. Plaintiff experienced pain in her right foot and ankle as the result of this twisting motion. Plaintiff reported the incident to her supervisor, Ms. Sheila Martin, on the day it occurred. Defendants accepted plaintiff's claim as compensable and provided plaintiff with medical treatment. This claim was properly treated initially as a medical-only claim.
4. On October 18, 2001, plaintiff first sought treatment at Rutherford Hospital following her October 16, 2001, injury. On that date, plaintiff reported experiencing right ankle and foot pain, and described the circumstances of her work-place injury. An examination revealed mild to moderate swelling and noted discomfort over the lateral malleolus and along the right fifth metatarsal. X-rays taken of plaintiff's foot and ankle were negative for fractures. Following her examination, plaintiff was diagnosed as having sustained a right ankle sprain for which she was prescribed medications, given an ankle brace and placed on work restrictions.
5. On October 23, 2001, plaintiff returned to Rutherford Hospital for a scheduled follow-up examination. Plaintiff reported that her ankle and foot were improving, but that she continued to experience some slight discomfort in her ankle and on the bottom of her right foot. Plaintiff was advised to continue using her brace, to continue rehabilitative exercises, and to elevate her right foot.
6. In November of 2001, plaintiff was instructed by her physician to elevate her right foot to hip level for one half hour out of each hour. Plaintiff provided her supervisor with the restriction paperwork, but the defendant-employer did not accommodate her. Plaintiff continued to work for defendant-employer following her injury and did not lose time from work during the period from October 16, 2001, to January 17, 2002. However the evidence showed that she was working beyond her restrictions during some periods of time, and because of failure to diagnose her plantar facial rupture, she was working beyond restrictions that would have been appropriate for such a condition.
7. Plaintiff was again examined at Rutherford Hospital on November 27, 2001. As of this date, plaintiff's pain was primarily along the bottom of her right foot. Following the examination, plaintiff was referred to physical therapy and released to work with restrictions of walking at her own pace and sitting and standing as necessary. A hospital physical therapist noted on December 20, 2001, "I do not know why she has such pain in her foot on the bottom. *** I thought Dr. Bob was going to refer me to a specialist."
8. Based upon the credible evidence of record, the Full Commission finds that when plaintiff was first released to return to light duty work, defendant-employer did not accommodate her restrictions; therefore, plaintiff continued to perform her regular duties in violation of her restrictions. With the revised restrictions assigned on November 27, 2001, defendant-employer accommodated plaintiff's needs and she was permitted to sit and stand as needed.
9. On January 16, 2002, plaintiff was confronted by her supervisor, Ms. Martin, who informed her that she was showing favoritism among the sewing machine operators in providing materials. This incident and discussion concluded with plaintiff being terminated, effective immediately. Although plaintiff was performing her regular duties as a service technician on this date, she remained under restrictions assigned by her medical providers of being able to sit and stand as needed.
10. According to the testimony of Ms. Martin, plaintiff was terminated for using obscene language. However, Ms. Martin's January 16, 2002, written statement regarding the termination does not indicate that plaintiff used obscene language on the date in question. Rather, the written statement indicates that plaintiff was terminated for showing partiality between co-workers, and relaying conversations with a supervisor to other employees. At the hearing, Ms. Martin admitted that plaintiff's conduct as alleged in the January 16, 2001, written statement would be insufficient to warrant her termination. The Full Commission finds the testimony of defendants' witnesses concerning termination of plaintiff and whether or not any other employee would be dismissed under similar circumstances to be not credible.
11. Based upon the credible evidence of record, the Full Commission finds that defendants have failed to prove that plaintiff's termination was for misconduct or fault for which a non-disabled employee would also have been terminated.
12. Subsequent to her termination, plaintiff attempted to secure suitable employment. In this effort, plaintiff applied to a variety of fast food restaurants. However, as of the close of the record by the Deputy Commissioner, plaintiff had been unsuccessful in obtaining employment due to her compensable injuries, although she had made reasonable efforts to do so.
13. Two weeks after plaintiff's termination, she was referred to Dr. Charles Bond at Rutherford Orthopaedics. Dr. Bond ordered plaintiff into physical therapy, prescribed medication, and placed her right foot in a cast. Thereafter, Dr. Bond determined that plaintiff should begin using a Samson walking boot, which assists with stability. As of the close of the record, plaintiff was still using this walking boot.
14. From January 16, 2002, into August 2002, plaintiff continued to experience pain along the bottom of her right foot. Eventually, due to her ongoing symptoms, Dr. Bond referred plaintiff to Dr. Hodge Davis, an orthopaedist with a sub — specialty in foot and ankle surgery. Plaintiff was first examined by Dr. Davis on August 23, 2002. During this examination, Dr. Bond noticed a loss of stretch of the plantar fascia, consistent with an old plantar fascial rupture. To confirm a diagnosis, Dr. Davis ordered an MRI of plaintiff's right foot. Plaintiff underwent the recommended MRI, but defendants refused to authorize a return visit to Dr. Davis. As a result, plaintiff was not able to obtain further medical treatment for eight (8) months. On April 30, 2003, Dr. Davis confirmed a diagnosis of a plantar fascial rupture, and recommended a distal tarsal tunnel release surgical procedure with partial plantar fasciotomy. However, defendants denied approval of the surgery, and plaintiff has yet to undergo the procedure recommended by Dr. Davis.
15. To a reasonable degree of medical certainty, Dr. Davis opined, and the Full Commission so finds, that plaintiff's plantar fascial rupture was caused by her work-related accident on October 16, 2001, and caused her to be unable to earn her regular wages without accommodation in the work to relieve plaintiff from the pain.
16. Because of her continued use of the Samson walking boot, which made the booted leg longer than the other leg and thus shifted alignment of her spine and hip, plaintiff developed lower back pain. For this condition, plaintiff has been treated by Dr. Danielle Rogers, a chiropractor. Dr. Rogers diagnosed plaintiff as having lumbar somatic dysfunction and myofascial pain associated with her improper gait from wearing the Samson walking boot. Dr. Rogers opined, based on a reasonable degree of chiropractic certainty, and the Full Commission so finds, that plaintiff's lumbar somatic dysfunction and myofascial pain is directly related to her October 16, 2001, injury by accident by reason of the Samson walking boot. On the issue of permanent disability, Dr. Rogers testified that if plaintiff could resolve her foot condition and end the use of the walking boot, she most likely would not have any permanent partial disability to her back.
17. On October 16, 2001, plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with defendant-employer.
18. As the direct and natural result of, and causally related to, her October 16, 2001, injury by accident, plaintiff sustained a plantar fascial rupture on her right foot and developed lumbar somatic dysfunction and myofascial back pain.
19. Because of the pain associated with the ankle sprain, plantar facial rupture of her right foot, lumbar somatic dysfunction and myofascial back pain, plaintiff has been unable to earn after the injury the same or greater wages she earned prior to the injury.
20. It should be noted that, pursuant to Deputy Commissioner Houser's Opinion and Award, defendants have now agreed to pay for plaintiff's distal tarsal tunnel release with partial plantar fasciotomy. Plaintiff underwent this surgical procedure on or about August 23rd, 2004. Plaintiff has been receiving temporary total disability benefits since the surgery. Thus, the defendants are contesting only the period of disability from the date of plaintiff's termination, which was January 16th, 2002, through the date of the surgery, and no further.
21. Defendants have gone to great lengths in an attempt to establish that plaintiff was performing full-duty, unrestricted work without complaints at the time she was terminated on January 16, 2002. However, virtually all of evidence cited by defendants to support their argument is either unreliable or simply not credible.
22. The medical records of Dr. Charles Bond of Rutherford Orthopaedics when read in conjunction with the other medical records of evidence proved that the plantar fascia rupture that plaintiff suffered at the same time of her ankle strain on October 16, 2002, went undiagnosed until January 29, 2002, nearly 2 weeks after plaintiff's discharge. The testimony of Dr. W. Hodges Davis proves that plaintiff was in pain from this condition from October 16, 2002, at least through the date he operated to correct the condition, August 23, 2004. With respect to the concurrence of both injuries, he testified:
 So she would get better from the ankle sprain, and the plantar fascia rupture she would get some better, and then the plantar fascia rupture will start getting worse because she's on it, and the ankle sprain will continue to get better. And there's that period where they cross, depending on her activity and kind of what she's doing.
23. Regardless of restrictions or no restrictions, the medical testimony proves that plaintiff was suffering pain at the time of her discharge and should not have been working on her feet. The medical testimony shows that at the point where the two injuries cross, about six to eight weeks after the initial injury, a person could expect to be experiencing heel and arch pain. A review of plaintiff's medical records during the 6 to 8 week time frame after the injury reveals just that; her pain is documented as being in the sole and heel of the foot, despite a "resolving ankle sprain."
24. The medical evidence indicates that the physician's assistant at Rutherford Hospital failed to diagnose the plantar fascial rupture, and subsequently assigned work restrictions based only on an ankle sprain. Thus, these medical records simply cannot be used as a basis for arguing that plaintiff was not disabled, because they are inherently unreliable. Had plaintiff been properly diagnosed from the beginning, she would have been assigned restrictions significantly more stringent than those assigned for an ankle sprain, which is evident from Dr. Davis's testimony:
 The difficulty is going to be standing. I mean, she would hurt if she would have to stand all day. So, realistically, she would stand, you know, two to three, maybe four hours in an eight-hour day intermittently without being pretty miserable.
25. Plaintiff's work history consisted of retail, fast food, and warehouse positions that required her to stand for most of the day. Plaintiff's job opportunities after termination would have been extremely limited, and possibly non-existent, since she was only capable of standing approximately 2 to4 hours during an 8-hour day. Plaintiff's testimony that she would take breaks and sit down to rest her foot all the way up until the time she was fired is credible, as is her testimony that she continued to have pain on the bottom of her foot.
26. Shortly after her termination, Dr. Bond placed plaintiff in the Samson walking boot, which she wore for the next 1 1/2 years. The walking boot is much more cumbersome than a splint and resulted in an uneven gait, causing significant back pain. This too contributed to plaintiff's inability to obtain employment. Plaintiff's plantar facial rupture limited her ability to stand and thus limited her wage-earning capacity. The addition of a walking boot, which caused an improper gait and significant back pain, made things even worse. Still, plaintiff managed to look for work after her termination, applying to virtually every fast food restaurant in the county. Unfortunately, as plaintiff soon found out when her unemployment benefits were terminated just 6 weeks after her discharge, "ain't nobody going to hire me with no boot on."
27. The medical providers who initially treated and misdiagnosed plaintiff, thus prolonging her healing period, were chosen by defendants. Then, one year after her injury, plaintiff was finally directed to a specialist who properly diagnosed her plantar facial rupture. However, at the very time that plaintiff could have been properly treated, defendants refused to authorize a return visit to Dr. Davis, thus delaying treatment an additional eight months.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On October 16, 2001, plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). As the direct and natural result of, and causally related to, her October 16, 2001, injury by accident, plaintiff sustained a sprained ankle, a plantar fascial rupture and developed lumbar somatic dysfunction and myofascial back pain. Id.
These conditions restricted her from work for which he was trained and resulted in a compensable disability. Plaintiff has proved that her disability extended from at least January 16, 2002, through August 23, 2004 and was continuing on that date. Priddy v. Cone Mills Corp.,58 NC App. 720, 294 S.E.2d 743 (1982); Hilliard v. Apex Cabinet Co.,305 NC 593, 290 S.E.2d 682 (1982); Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993); Johnson v. Southern Tire Salesand Service, ___ NC ___, 599 S.E.2d 508 (2004); Coppley v. PPG Indus.,Inc., 133 N.C. App. 631, 516 S.E.2d 184 (1999).
2. Based upon the credible evidence of record, defendants have failed to prove that plaintiff's termination was for misconduct or fault for which a non-disabled employee would also have been terminated. Seagravesv. Austin Co. of Greensboro, 123 N.C. App. 28, 472 S.E.2d 587 (1996). Accordingly, plaintiff's termination did not constitute a constructive refusal of suitable employment. Id.; and N.C. Gen. Stat. § 97-32. Additionally, had plaintiff been fired for misconduct, the misconduct was not the reason she was unable to earn wages — her sprained ankle, her plantar facial rupture, her lumbar somatic dysfunction and her myofascial back pain prevented her from obtaining jobs commensurate with her past work experience, and defendants have not offered retraining. McRae vs.Toastmaster, Inc., 358 N.C. 488, 597 S.E.2d 695 (2004).
3. As a result of her October 16, 2001, injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $200.00 per week for the period of January 16, 2002, to the present and continuing until she returns to suitable employment, or until further Order of the Commission. N.C. Gen. Stat. §97-29.
4. As a result of her October 16, 2001, injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, including the chiropractic care from Dr. Rogers, and the foot surgery recommended by Dr. Davis, as reasonably necessary to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19); 97-25; and 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $200.00 per week for the period of January 16, 2002, to the present and continuing until she returns to suitable employment, or until further Order of the Commission. The portion of this compensation that has accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein. Interest at 8 percent per annum shall be paid on all overdue compensation, with an interest start date of October 14, 2003. Defendants may take a credit for unemployment compensation paid to plaintiff during a six-week period.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as a result of her October 16, 2001, injury by accident, including the chiropractic care from Dr. Rogers, and the foot surgery recommended by Dr. Davis, as reasonably necessary to effect a cure, give relief, or lessen plaintiff's disability.
3. Defendants shall pay to plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein. Defendants shall pay one-fourth (1/4) of the accrued compensation due plaintiff directly to plaintiff's counsel in a lump sum, thereafter defendants shall pay every fourth check to plaintiff's counsel.
4. Defendants shall pay costs.
This 20th day of December 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN